2024 IL App (1st) 220137

Nos. 1-22-0137, 1-22-0138, 1-22-0311 (cons.)

Sixth Division

December 20, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| CHANDRAKANT SONI, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | Nos.    21 L 50137 |
| v. | ) ) | 21 L 50143 21 L 50152 |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, DIRECTOR OF EMPLOYMENT SECURITY, THE BOARD OF REVIEW, and FRESENIUS KABI USA, LLC, | ) ) ) ) ) | |
| Defendants,            (Appeal No. 1-22-0311) | ) ) | |
| (The Department of Employment Security, Director of Employment Security, and The Board of Review, | ) ) | |
| Defendants-Appellants). | ) ) ) | |
| MARCELINO SALINAS , | ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, DIRECTOR OF EMPLOYMENT SECURITY, THE | ) ) | |

Nos. 1-22-0137, 1-22-0138, 1-22-0311 (cons.)

| | |
|---|---|
| BOARD OF REVIEW, and FRESENIUS KABI USA, LLC, | ) |
| | ) |
| | ) |
| Defendants,      (Appeal No. 1-22-0137) | ) |
| | ) |
| (The Department of Employment Security, Director of Employment Security, and The Board of Review, | ) |
| | ) |
| | ) |
| Defendants-Appellants). | ) |
| | ) |
| | ) |
| ALAN LICUDINE , | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, DIRECTOR OF EMPLOYMENT SECURITY, THE BOARD OF REVIEW, and FRESENIUS KABI USA, LLC, | ) |
| | ) |
| | ) |
| Defendants,      (Appeal No. 1-22-0138) | ) |
| | ) |
| (The Department of Employment Security, Director of Employment Security, and The Board of Review, | ) Honorable |
| | ) Daniel P. Duffy and John J. |
| Defendants-Appellants). | ) Curry Jr., |
| | Judges, presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court, with opinion.
Justices Hyman and Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1      In these consolidated appeals, administrative referees heard evidence and found that the

plaintiffs-appellees (Claimants), three former long-time employees of Fresenius Kabi USA, LLC

- 2 -

(Fresenius), a global healthcare and pharmaceutical company, were ineligible for unemployment insurance benefits because they engaged in misconduct when they falsely signed logs certifying they cleaned their pharmaceutical compounding work areas and were consequently terminated. The Claimants appealed the referees' decisions to the Illinois Department of Employment Security's Board of Review (Board), the five-member administrative body that hears and decides appeals from a referee's decision. The Board unanimously affirmed the referee's decision as to each Claimant. The Claimants then appealed to the circuit court, which reversed, finding that the unrebutted evidence established that Fresenius pressured its employees to falsely certify they had cleaned their work areas in order to maximize pharmaceutical production time.

¶ 2     The Board and other IDES defendants now appeal to us, arguing that the Board's decisions finding the Claimants ineligible for benefits were neither against the manifest weight of the evidence nor clearly erroneous. We agree with the circuit court that the Claimants did not engage in willful misconduct and therefore affirm the circuit court and reverse the decisions of the Board.

¶ 3     These consolidated cases also raise a broader issue, ironically relating to the Board members' signatures certifying their decisions. In their briefs, the Claimants contend that Board members merely acts as "rubber stamps." They suggest that, despite affixing their signatures to the decisions prepared by the Board's staff attorney, most Board members did not review the record and independently decide the cases.

¶ 4     Each member of the Board signed his or her name to the decisions denying the Claimants' unemployment benefits, which should signify that each Board member independently reviewed the record and conscientiously determined the Claimants were ineligible for benefits. However, when asked at argument if our understanding was correct, the Board's counsel said he could not

confirm this. Although the Board's counsel accepted an invitation to follow-up with answers to our questions, its supplemental brief provided no clarification. In 2018, however, an Illinois Labor Relations Board administrative law judge (ILRB ALJ) made extensive factual findings regarding the Board's decision-making process in a dispute over whether attorneys who write decisions for the Board are managerial and therefore excluded from collective bargaining under the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2016)). She found that only one member of the Board actually decides an appeal. *State of Illinois Department of Central Management Services*, Ill. Labor Relations Bd., State Panel, No. S-UC-17-028 (Administrative Law Judge's Recommended Decision and Order Sept. 17, 2018), https://ilrb.illinois.gov/content/dam/soi/en/web/ilrb/decisions/decisionorders/documents/s-uc-17-028rdo.pdf [https://perma.cc/XM2T-YXY3] (IDES Unit Clarification Decision). Consequently, the other four members of the Board have no involvement in the decision-making process and their signatures on Board decisions are, as the Claimants contend, mere "rubber stamps."

¶ 5    Claimants did not raise in the circuit court an administrative due process challenge to the Board's decision-making process, and ultimately, it does not factor in our analysis to reverse the Board's decisions. Nevertheless, we use these consolidated appeals to urge executive and legislative review of the Board's decision-making process and practice. We do not know the current practice, but if each member of the Board is not deciding each case, as the IDES Unit Clarification Decision found, then they act in derogation of the statutory parameters for administrative adjudication and potentially deprive parties of their administrative due process rights.

¶ 6    To be clear, it is unnecessary for us today to find that the Board has violated the law in any respect. Rather, we urge the Governor and General Assembly to examine the Board's decision-making process to ensure compliance with the law, so that all Illinoisians, employees and employer alike, receive the economic and procedural justice they are due.

¶ 7                                 I. BACKGROUND

¶ 8    In these consolidated appeals, the Illinois Department of Employment Security (IDES), the Director of Employment Security (Director), and the Board (collectively, the IDES defendants) appeal from orders of the circuit court reversing the Board's decisions to deny Marcelino Salinas, Alan Licudine, and Chandrakant Soni's claims for unemployment benefits. The employer, Fresenius, does not appeal. Because the Board's decisions are clearly erroneous, we affirm the decision of the circuit court.

¶ 9                               A. Marcelino Salinas

¶ 10    Marcelino Salinas was employed by Fresenius as a pharmaceutical compounder for 22 years, from August 20, 1998, through July 20, 2020, when his employment was terminated, along with 39 coworkers in his department. Salinas applied for unemployment insurance benefits and, on July 25, 2020, completed an IDES misconduct questionnaire, wherein he stated that he did not know the reason for his discharge, was unaware of any company policy or rule concerning the last act or circumstance which caused his discharge, and that he had not received prior warnings.

¶ 11    Salinas's claim was reviewed by an IDES claims adjudicator. Contesting the claim, Fresenius responded that Salinas was discharged for falsifying records. According to Fresenius, Salinas signed a document indicating that he cleaned his assigned "bays," but the video surveillance confirmed that the cleaning did not take place. Fresenius claimed that Salinas was

made aware of the policy and the behavior that contributed to his discharge and that he did not admit to falsifying the records but rather stated that the cleanings were performed.

¶ 12    Fresenius submitted a copy of its human resources (HR) policy, which states that "[e]very employee has the duty and the responsibility to be aware of and abide by existing rules and policies," and "[i]t is the supervisor's responsibility to maintain, communicate, and consistently apply standards of job performance and personal conduct and to ensure that each employee is made aware of unsatisfactory performance and conduct on a timely basis." The HR policy also states that when an employee's performance violates workplace rules, "the purpose of all corrective action" should be to correct the employee's conduct, and the supervisor "shall *counsel* the employee and allow reasonable time to meet acceptable standards." (Emphasis in original.) The HR policy lists unacceptable behaviors, including "[f]alsifying or altering any Company record including *** time records or withholding of any relevant information."

¶ 13    The claims adjudicator interviewed Salinas (in Spanish), who stated that falsification was "normal practice because of time constraints." Salinas stated that the company "wanted quantity and not quality," so when employees did not have time to complete "the job," they would falsify the documents to show that they completed it. Management knew of the situation, because it also falsified documents. Salinas stated that the falsification became "normal practice" over the past few years, after the company changed ownership.

¶ 14    On August 18, 2020, the claims adjudicator determined that Salinas's claim should be denied because he was discharged due to falsification of records in violation of Fresenius's HR policy. Because Salinas was discharged for misconduct, the claims adjudicator concluded that he was ineligible for unemployment insurance benefits.

¶ 15    Salinas appealed the claims adjudicator's decision, and the matter proceeded to a telephone hearing with a referee on October 23, 2020.

¶ 16    At the hearing, Peter Higley, Fresenius's HR administrator, testified that Salinas was discharged for falsification of cleaning logs. Higley said he reviewed videos of Salinas working that established Salinas did not complete the cleaning, although Salinas "sign[ed] off" in the log that it had been performed. These videos were not submitted to Fresenius's in-house counsel or the referee. Higley also said that, according to the HR policy of which Salinas was aware, falsification would result in immediate termination. Higley did not know whether Salinas had any explanation regarding Fresenius's accusation of falsification. Because Fresenius's facility was FDA approved, certain standards for the manufacture of products had to be followed.

¶ 17    On cross-examination, Higley stated that the 33 employees and 7 supervisors comprising Salinas's department were terminated on the same day for the same reason. Nick Strollett, to whom the supervisors reported, also resigned "around" the same time. The falsified logs were signed by "the performer performing the cleaning, a verifier verifying the cleaning, and *** the supervisor." Fresenius's HR personnel learned of the falsification issue by an anonymous call to their hotline. Salinas had not been disciplined prior to his termination.

¶ 18    Salinas testified that he was informed that he was terminated because he "signed some paperwork without doing the job." Salinas, a pharmaceutical compounder, worked four 12-hour shifts weekly. Five or six compounders and two supervisors worked each shift. Besides compounding, Salinas was required to clean everything "related to the component department." Salinas said that sometimes there was not enough time to do everything, so he signed the papers without cleaning; the supervisor was likely aware of the situation because he "was on the floor."

Salinas said that his supervisor "used to move the cameras" when Salinas worked. The team leader was responsible for "checking everything" and telling the employees "what to do and what not to do." Salinas was never a team leader. "Most of the time" the team leader completed "the paperwork," which the employees signed, but the team leader wrote the times.

¶ 19    Salinas stated that, 10 years prior, the company "doubled the production" without increasing the number of compounders, so the compounders no longer had enough time to perform all tasks. The priority was compounding the products. The compounders told their supervisors they did not have enough time. The supervisors never told the employees directly to sign the cleaning logs, but Salinas believed that they instructed the team leaders, because the team leaders completed the paperwork for the compounders to sign. All the employees and the supervisor signed the paperwork, and Salinas was afraid that he would be fired if he did not sign. The supervisor did not directly tell the compounders to sign the form, but all of the compounders signed, so Salinas also signed. The company awarded Salinas a gift card if he completed the job.

¶ 20    In a decision mailed to Salinas on October 27, 2020, the referee affirmed the claims adjudicator's decision, finding that Salinas admitted to signing logs for approximately 10 years falsely certifying that the workstations were cleaned. Further, because cleaning was important to the pharmaceutical compounding process, Salinas's conduct placed the pharmaceutical product and patients at risk. The referee concluded that Salinas was ineligible for benefits because he was discharged for misconduct connected with his work, namely, that he deliberately and willfully violated Fresenius's policy prohibiting falsification of company records.

¶ 21    Salinas appealed to the Board on November 10, 2020. On January 14, 2021, Salinas's attorney mailed a letter to the Board containing written argument on behalf of Salinas. In it, he

stated that his firm represented 30 of the 33 discharged Fresenius employees. Of the 30 employees, 25 employees ultimately were awarded benefits, and of the 5 employees who were not, the appeals of 2 of the employees remained pending. Salinas's attorney also represented appellants Licudine and Soni in these consolidated appeals.

¶ 22    Counsel argued that the corporate culture of Fresenius encouraged employees to treat cleaning as the lowest priority and established a practice of falsifying documents to inaccurately show that cleaning took place. Counsel attached decisions from seven other related Fresenius unemployment appeals, where the referees ruled for the employees due in part to express or implied instructions from management to falsify the cleaning logs. Although one of these decisions was mailed to a claimant on October 20, 2020, prior to Salinas's telephone hearing before the referee, the other six decisions were mailed to the claimants after Salinas's October 23, 2020, hearing.

¶ 23    On February 23, 2021, the Board mailed its decision affirming the referee's decision and finding Salinas ineligible for benefits. The Board first stated that it considered the arguments in Salinas's January 14, 2021, letter but did not consider the additional evidence submitted by Salinas, including the decisions from other related Fresenius unemployment appeals, because Salinas "failed to set forth a sufficient explanation showing that for reasons not his fault and outside his control he was unable to introduce the evidence" at the hearing before the referee. The Board found that the evidence before the referee did not establish that Salinas was instructed to falsify documents and instead supported the conclusion that Salinas was discharged for "knowingly and willingly" falsifying the cleaning log and that his actions were "a deliberate and willful violation"

of the HR policy, which caused Fresenius harm. Thus, because Salinas was discharged for misconduct, he was not eligible for benefits.

¶ 24　On March 23, 2021, Salinas filed a *pro se* complaint for administrative review in the circuit court of Cook County. On March 26, 2021, counsel filed an appearance on behalf of Salinas. In a supporting brief, counsel argued that the Board erred in disregarding the context of the mass terminations and the decisions of numerous other referees awarding benefits to other Fresenius employees, who all followed the same Fresenius workplace practice and culture as Salinas. Fresenius filed an appearance in the circuit court but did not file a brief or present argument.

¶ 25　On December 30, 2021, the circuit court reversed the Board's decision in a written order. The court found that Fresenius did not present evidence to rebut Salinas's testimony that he was directed to sign cleaning logs that were prepared by his supervisors. The court found that Salinas's testimony was not "inherently improbable," and therefore, he was not deliberately or willfully violating Fresenius's policy against falsifying records but rather was "complying with company-endorsed directives." The court found that the unrebutted record established that Fresenius maintained a culture and practice of falsifying cleaning records and noted that Salinas's termination for falsifying cleaning records "was not unique." The court also noted that because the rule was not consistently enforced or observed, it was not reasonable as a matter of law, and so it was unreasonable to expect Salinas to observe a rule that he was "specifically told, time and again, to ignore by superiors." The IDES defendants timely appealed.

¶ 26　　　　　　　　　　　　　　B. Alan Licudine

¶ 27　Alan Licudine was employed by Fresenius as a pharmaceutical compounder for 16 years, from March 15, 2004, through July 20, 2020, when his employment was terminated. Licudine

submitted a claim for unemployment insurance benefits, which was reviewed by an IDES claims adjudicator. Contesting the claim, Fresenius responded that Licudine was discharged for falsifying records. According to Fresenius, Licudine certified that he cleaned his assigned bays, but video surveillance confirmed that the cleaning did not take place. Fresenius claimed that Licudine was aware of the policy and the behavior that contributed to his discharge, and he did not admit that he falsified the records but rather stated that the cleanings were performed.

¶ 28    Fresenius provided copies of its standard operating procedure (SOP) and HR policy. The SOP in the record on appeal contains subsections that have been highlighted in a dark color, making them illegible. The HR policy contains the same language, outlined above, as in Salinas's case. Fresenius also provided a copy of Licudine's June 16, 2020, cleaning log, which notes the times when different rooms were sanitized. The log entries were initialed as performed by "SV," verified by "AL," and reviewed by a supervisor. The copy of the log in the administrative record is faint and illegible in places.

¶ 29    On August 18, 2020, the claims adjudicator determined that Licudine was discharged due to submission of false information in violation of Fresenius's company policy. Because Licudine was discharged for misconduct, the claims adjudicator concluded that he was ineligible for unemployment insurance benefits.

¶ 30    Licudine appealed the claims adjudicator's decision, and the matter proceeded to a telephone hearing before a referee on October 6, 2020. At the hearing, Higley testified that Licudine was discharged for falsification of cleaning logs for the formulation area where a drug was compounded. Higley testified that Licudine's work logs established that he both cleaned and

verified that other employees cleaned, but a video review established that "not all areas were cleaned," and the log entries asserting that these areas had been cleaned were, therefore, falsified.

¶ 31    On July 9, 2020, Higley spoke with Licudine, who explained that daily cleanings take "about 2.5 hours." According to Higley, Licudine denied that the cleanings could not be performed and asserted that "they always took the time to complete the cleanings." Licudine also said he had never been instructed by supervisors or group leaders to sign the log even if cleaning had not been performed. Licudine told Higley that the video footage would show him cleaning. HR personnel for Fresenius learned of the falsification issue by an anonymous call to their hotline. According to Higley, Licudine was never warned about the issue "because based on the policy it was to be an immediate termination."

¶ 32    On cross-examination, Higley stated that Licudine had successfully performed the required duties in the past and so understood the procedure.

¶ 33    On redirect examination, Higley testified that the June 16, 2020, cleaning log that Licudine signed established that he cleaned bays 7B and 7C and verified that bay 7A had been cleaned. As verifier, Licudine was required to view the cleaning, but the video review established that he was not present during the times specified in the cleaning log.

¶ 34    On recross examination, Higley stated that he believed Licudine cleaned the areas correctly in the past due to the lack of prior complaints. Licudine was one of 40 employees terminated by Fresenius on the same day for the same reason. According to Higley, "a few supervisors" were terminated for the same reasons as Licudine.

¶ 35    Licudine testified that he received a copy of Fresenius's SOP, which states, "clean *** once per shift." Licudine testified that he cleaned only "once per shift," but not at the time indicated

in the log, and personnel did not see him cleaning in the video because he cleaned it at a different time. Licudine then testified that he did not recall "those dates." Fresenius management informed the employees "to lie on the paperwork for years" regarding the times on the cleaning log.

¶ 36    Licudine worked for the company for approximately 16 years, and Fresenius took over ownership at some point during that time. During the time Licudine worked for the company, he had five different supervisors, who were all aware of the issue and informed Licudine to write false or misleading information on the logs. Licudine also heard a supervisor tell a coworker to write false or misleading information on the sanitation paperwork. Licudine was never informed by Fresenius's senior management to falsify the cleaning logs, but the manager, who was "above" the supervisors, also informed him to write false or misleading information on the paperwork. Licudine did not have time to both clean and perform his pharmaceutical compounding duties.

¶ 37    On cross-examination, Licudine stated that he knew that falsifying the logs was "wrong" but was following instructions. Licudine was not aware of employee assistance programs but understood that he could have discussed the issue with management. Licudine did not do so because he "love[d] his job."

¶ 38    When questioned by the referee about inconsistencies in his testimony, Licudine testified that he knowingly did not clean but wrote in the log that he had done so. Following Licudine's testimony, Higley was recalled and testified that Fresenius offered employee assistance, available to all employees, where the employee can discuss personal or work issues.

¶ 39    In a decision mailed to Licudine on October 9, 2020, the referee affirmed the claims adjudicator's decision, finding that Licudine wrote in cleaning logs that he cleaned certain areas, but Fresenius discovered that the cleaning was not performed after viewing video footage.

Licudine was aware of the correct procedure to follow but was directed by his manager to not follow the company's procedure and instead, at times, did not clean as required but documented on his logs that he had cleaned. Licudine never went to management about the issue "because he likes his job." The referee concluded that Licudine was ineligible for benefits because he was discharged for misconduct connected with his work, namely that he deliberately and willfully violated Fresenius's cleaning log policies, which harmed Fresenius's business interests. The referee stated that "[t]he claimants [*sic*] actions were within his control to avoid." Licudine appealed to the Board on November 4, 2020.

¶ 40    On January 18, 2021, Licudine's attorney mailed a letter to the Board containing written argument on behalf of Licudine. This letter made similar points as the letter that counsel sent to the Board on behalf of Salinas. Counsel attached decisions from other related Fresenius unemployment appeals, where the referees ruled for the employees due in part to express or implied instructions from management to falsify the cleaning logs. All seven attached referee decisions were mailed to the parties after Licudine's October 6, 2020, telephone hearing before the referee.

¶ 41    On February 22, 2021, the Board mailed its decision, affirming the referee's decision. The Board first noted that it considered the arguments in Licudine's January 18, 2021, letter but did not consider Licudine's request to submit additional evidence because Licudine "failed to set forth a sufficient explanation showing that for reasons not his fault and outside his control he was unable to introduce the evidence" at the hearing before the referee. The Board found that the evidence established that Licudine was aware of Fresenius's policies prohibiting falsification of documents but had not been warned about the issue by Fresenius prior to his discharge. Licudine admitted to

signing cleaning logs where he had not performed the required cleaning. The Board found that Licudine knew that falsifying the documents was "wrong" but did so regardless, and never informed management or the employee assistance program that he was instructed to do so by his supervisors. The Board concluded that "[t]he mere fact that the employer's supervisors allegedly condoned the falsification of documents does not absolve the claimant of his violation of the employer's policy." Thus, because Licudine was discharged for misconduct, he was not eligible for benefits.

¶ 42   On March 25, 2021, Licudine filed a *pro se* complaint for administrative review in the circuit court of Cook County. On March 26, 2021, counsel filed an appearance on behalf of Licudine. In a supporting brief, counsel argued that the Board erred in disregarding the context of the mass terminations and the decisions awarding benefits to other Fresenius employees, who all adhered to the same Fresenius workplace practice and culture as Licudine. Fresenius filed an appearance in the circuit court but did not file a brief or present argument.

¶ 43   On December 30, 2021, the circuit court reversed the Board's decision in a written order. The court found that Fresenius presented no evidence to rebut Licudine's testimony that he was instructed by supervisors and other management to falsify cleaning logs over "a number of years." The court found that Licudine "in no way" deliberately or willfully violated Fresenius's policy against falsifying records, because such behavior was a matter of practice in Fresenius's workplace culture. The court noted that Licudine's termination for falsifying the cleaning records was "not unique," and because the practice was "expressly fostered" by supervisors, "[i]t is unreasonable to expect an employee to observe a rule that he is specifically told, time and again, to ignore by superiors." The IDES defendants timely appealed.

¶ 44                                C. Chandrakant Soni

¶ 45    Chandrakant Soni was employed by Fresenius as a pharmaceutical compounder for eight years, from July 9, 2012, through July 20, 2020, when his employment was terminated due to noncompliance with a Fresenius policy. On July 25, 2020, Soni completed an IDES misconduct questionnaire, wherein he stated that he was aware of the policy, but that it was "never implemented." Soni stated that the company had too few employees to do the necessary work, which "a few management levels knew about," and employees "were encouraged" to document work as completed even though "it was not performed according to specs." Soni noted that he received "good ratings" and "no one ever pointed out this until now." Soni stated that the situation was "a setup for failure" and "[n]o concern was raised until now," and that the encouraged practice "helped with profits."

¶ 46    Soni submitted a claim for unemployment insurance benefits, which was reviewed by an IDES claims adjudicator. Contesting the claim, Fresenius responded that Soni was discharged for falsifying records. According to Fresenius, Soni certified that he performed the required cleaning of his assigned bays, but video surveillance confirmed that the cleaning did not take place.[1] Fresenius claimed that Soni was aware of the policy and the behavior that contributed to his discharge, and he did not admit that he falsified the records but rather stated that the cleanings were being performed. Fresenius submitted a copy of its HR policy, which contains the same language as in Salinas's and Licudine's cases.

_____

[1]Fresenius's submission states, "[h]owever, video review confirmed cleaning was performed." Based on context, this appears to be a typographical error.

¶ 47    On August 12, 2020, the claims adjudicator determined that Soni was discharged due to submission of false information in violation of Fresenius's company policy. Because Soni was discharged for misconduct, the claims adjudicator concluded that he was ineligible for unemployment insurance benefits.

¶ 48    Soni appealed the claims adjudicator's decision, and the matter proceeded to a telephone hearing with a referee on October 16, 2020. At the hearing, Higley testified that Soni was a pharmaceutical compounder with duties that ranged from cleaning the area where "the drug" was manufactured and weighing the equipment to formulating the drug to be sent to the filling department. Soni was discharged for falsification of cleaning logs, which was grounds for immediate termination. Higley said that he viewed videos of Soni's 12-hour shifts on 2 days and determined Soni did not clean or verify another employee's cleaning during the two shifts, despite signing the log verifying that the cleaning had taken place. Higley said all employees were trained annually on Fresenius's "good documentation practice."

¶ 49    Under the good documentation practice, employees sign and date the cleaning log "when they're performing the task," or when they verify another person performed the task; the verifier must be present at the time the task is performed. Failing to properly clean the areas "results in deviations for the batches that are being produced."

¶ 50    On cross-examination, Higley stated that all 33 compounders in Soni's department were terminated on July 20, 2020, for falsifying cleaning logs. The compounders reported to seven supervisors, and the department was overseen by a manager who resigned. "[F]or many years," Fresenius had a contract to manufacture Abraxane, a chemotherapy drug, and approximately half

of the discharged Fresenius employees spent "substantially all of their time" manufacturing it. In spring 2020, Fresenius lost its contract to produce Abraxane.

¶ 51    Soni testified that he worked for the company for eight years, and over time, fewer people worked in his department. A supervisor informed Soni that of their responsibilities, formulation was the first priority and sanitization was last. Soni was one of five compounders during his shift, and they reported to two supervisors. At this point, the referee stopped the hearing and told Soni that he needed an interpreter because his accent was "thick," and she could not understand him. The referee scheduled another telephone hearing with an interpreter.

¶ 52    At the next hearing on October 22, 2020, Soni testified through an interpreter that there was not always time to both make the drugs and clean and "[f]or cleaning [he] wasn't getting much *** time." Soni's priority was first to make the product, second to clean, and third to sanitize. "Most of the time," the supervisors were in the same room or rooms as the compounders were as they did their assigned tasks, and were aware of how the compounders were "spending [their] time." Soni spoke with his supervisors "[a]lmost every day" about the fact that he did not have enough time to clean. Sometimes if cleaning had not been completed, the supervisor pressured the compounders to sign the form stating that they had cleaned or verified another's cleaning.

¶ 53    On cross-examination, Soni stated that he signed the cleaning log knowing that he did not perform the cleaning and was following his supervisor's instructions. Soni knew that Fresenius had a policy against falsifying company documents. He stated that he "had to do this to keep" his job. Soni tried "several times" to speak with the manager who was above the supervisors, but was informed that his complaints had "to be done to the supervisor" and the supervisor would speak to the manager. Soni never went to the HR department to complain about the issue.

¶ 54    In a decision mailed to Soni on October 27, 2020, the referee affirmed the claims adjudicator's decision, finding that Soni signed cleaning logs knowing that he did not clean or verify that the cleaning had been completed. The practice was condoned by the supervisors, and Soni was "rebuffed" when he attempted to speak with management, but he did not attempt to contact human resources or the tip hotline to advise them of the violations. The referee concluded that Soni was ineligible for benefits because he was discharged for misconduct connected with his work, specifically that he deliberately and willfully violated Fresenius's policies.

¶ 55    Soni appealed to the Board on November 4, 2020. On January 20, 2021, Soni's attorney mailed a letter to the Board containing written argument on behalf of Soni. This letter contained similar arguments as the letters that counsel sent on behalf of Salinas and Licudine. Counsel also commented that approximately half of the 33 terminated compounders made Abraxane that was exported to China. In March 2020, China's National Medical Products Administration banned the importation of Abraxane from Fresenius's facility due to "quality control issues." Counsel attached two articles from early 2020 about Fresenius's recall of Abraxane. Counsel also attached eight decisions from other related Fresenius unemployment appeals, where the referees ruled for the employees due in part to implied or overt instructions from management to falsify the cleaning logs. Of the decisions where the mailing date is legible, five of the eight decisions were mailed to the parties after Soni's second telephone hearing before the referee on October 22, 2020.

¶ 56    On February 22, 2021, the Board mailed its decision affirming the referee's decision. The Board first noted that it considered the arguments in Soni's January 20, 2021, letter, but did not consider Soni's request to submit additional information because Soni "failed to set forth a sufficient explanation showing that for reasons not his fault and outside his control he was unable

to introduce the evidence" at the hearing before the referee. The Board found that the evidence established that Soni was aware of Fresenius's policies prohibiting falsification of documents but had not been warned about the issue by Fresenius prior to his discharge. Soni admitted to signing cleaning logs where he had not performed the required cleaning. The Board found that Soni failed to present any credible firsthand evidence to show that he was discharged for a reason other than falsification of documents. Although Soni's supervisors condoned the practice, Soni never went to Fresenius's HR department to inform them of the issue. The Board concluded that "[t]he mere fact that the employer's supervisors allegedly condoned the falsification of documents does not absolve the claimant of his violation of the employer's policy." Thus, because Soni was discharged for misconduct, he was not eligible for benefits.

¶ 57    On March 22, 2021, Soni filed a *pro se* complaint for administrative review in the circuit court of Cook County. On March 26, 2021, counsel filed an appearance on behalf of Soni. Fresenius filed an appearance in the circuit court but did not file a brief or present argument.

¶ 58    In a supporting brief, counsel argued that the Board erred in disregarding the mass terminations and the decisions related to the other discharged Fresenius employees, who all adhered to the same Fresenius workplace practice and culture as Soni. Counsel also noted that approximately half of the 33 claimants spent their time making Abraxane, which was exported to China until March 2020, when China's National Medical Products Administration banned the importation of the drug from Fresenius's facility due to quality control issues.

¶ 59    On December 15, 2021, the circuit court reversed the Board's decision and remanded to the Board for further proceedings in a written order. First, the court found that the Board erred when it found Soni engaged in misconduct, because Fresenius's rule was not reasonable when

violation of the rule was "routinely and systematically encouraged, and even mandated," by Soni's supervisors. The court looked to Pennsylvania law because Illinois unemployment law on the issue was "wanting." The court found that affirming the Board's decision "could be seen as tacitly condoning Fresenius's fraud and its violation of safety standards" and might encourage other companies to adopt similar practices. The court stated that Soni's failure to complain to Fresenius's human resources department was irrelevant given the unreasonableness of Fresenius's policy. The court also found that the Board's finding that Soni provided no credible evidence to contradict Fresenius's evidence was erroneous because Higley's testimony had no bearing on Soni's credibility. The court noted the "strong possibility" that the Board's view of Soni's testimony "was influenced in part by the muddled ALJ Hearing transcript, given that [Soni] required an interpreter."

¶ 60    On January 10, 2022, the IDES defendants filed a motion to reconsider or clarify the court's order, arguing, *inter alia*, that the court impermissibly reweighed evidence on judicial review and improperly looked to jurisdictions outside of Illinois. The IDES defendants alternatively sought clarification as to whether the court was reversing the Board's decision outright.

¶ 61    On February 2, 2022, the court entered an order denying the IDES defendants' motion to reconsider and clarified that its December 15, 2021, order reversed the Board's decision and was, therefore, final and appealable. The IDES defendants timely appealed. Fresenius did not appeal.

¶ 62                                   II. ANALYSIS

¶ 63                  A. The Claimants Did Not Engage in Misconduct and

                          Are Entitled to Unemployment Insurance Benefits

- 21 -

¶ 64     On appeal, the IDES defendants assert that the Board's decisions that the Claimants were ineligible for benefits because they were discharged for misconduct were neither against the manifest weight of the evidence nor clearly erroneous. The IDES defendants argue that the record establishes that the Claimants willfully violated Fresenius's reasonable work policy against falsification of records and caused harm to Fresenius.

¶ 65     Under the Unemployment Insurance Act (Act) (820 ILCS 405/1100 (West 2020)), any decision by the Board of Review shall be reviewable by the circuit court in accordance with the provisions of the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2020)). On appeal, we review the decision of the Board, not that of the circuit court. *Petrovic v. Department of Employment Security*, 2016 IL 118562, ¶ 22.

¶ 66     The standard of review, and thus the deference afforded to the Board's decision, depends on whether the issue involved is a question of fact, law, or a mixed question of fact and law. *Leach v. Department of Employment Security*, 2020 IL App (1st) 190299, ¶ 22. The Board's factual findings are considered *prima facie* correct and will be reversed only if they are against the manifest weight of the evidence. *Id.* The Board's legal determinations are reviewed *de novo*. *Id.* Mixed questions of fact and law, namely situations where "the historical facts are admitted or established and the only question is whether the facts satisfy the statutory standard, are subject to reversal only where they are clearly erroneous." *Id.* A decision is clearly erroneous where the reviewing court is left with "the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001).

¶ 67    Here, the Board's determination that Claimants were discharged for misconduct as defined by the Act is a mixed question of law and fact and will be reviewed for clear error. *Petrovic*, 2016 IL 118562, ¶¶ 21-22.

¶ 68    The Act's main purpose is to "relieve the economic insecurity caused by involuntary unemployment" and, thus, must be construed liberally in favor of awarding unemployment benefits to unemployed workers. *Id.* ¶ 23. Nevertheless, certain unemployed individuals are disqualified from obtaining benefits, including those who were discharged for "misconduct" connected with their work. 820 ILCS 405/602(A) (West 2020). Under the Act, an employee was discharged for misconduct if "(1) the employer had a reasonable work rule, (2) the employee deliberately and willfully violated the rule, and (3) the violation either was repeated by the employee despite a prior warning or harmed the employer." *Cannici v. Department of Employment Security Board of Review*, 2021 IL App (1st) 181562, ¶ 41.

¶ 69    The employer has the burden of proving that the employee was discharged for misconduct, which is a "higher burden" than merely proving that the employee "should have been rightly discharged." (Internal quotation marks omitted.) *Petrovic*, 2016 IL 118562, ¶¶ 27-28. Disqualification for misconduct is intended for individuals who "intentionally commit conduct which they know is likely to result in their termination." *Id.* ¶ 27. A reasonable work rule "provides guidelines that are or should be known by the employee." *Garner v. Department of Employment Security*, 269 Ill. App. 3d 370, 375-76 (1995). Willful misconduct occurs when the employee "is aware of a company rule and consciously disregards it." *Alternative Staffing, Inc. v. Illinois Department of Employment Security*, 2012 IL App (1st) 113332, ¶ 31.

¶ 70    These consolidated cases appear to present an issue of first impression because neither party has cited any case considering employee misconduct where the misconduct is directed by the employer. In other issues of first impression under the Act, we have previously sought guidance from Pennsylvania law because the Pennsylvania unemployment benefits statute is substantively similar to ours. See *Messer & Stilp, Ltd. v. Department of Employment Security*, 392 Ill. App. 3d 849, 857 (2009). Under Pennsylvania law, a work rule can be deemed reasonable if the employer's "application of the rule under the circumstances is fair, just and appropriate to pursue a legitimate interest." *Caterpillar, Inc. v. Unemployment Compensation Board of Review*, 703 A.2d 452, 456-57 (Pa. 1997). However, Pennsylvania courts have found that an employer has not proven an employee's willful misconduct where the employee acts in accordance with a practice that the employer is aware of and tolerates although it is at odds with a formal company policy. See *Great Valley Publishing v. Unemployment Compensation Board of Review*, 136 A.3d 532, 538-39 (Pa. Commw. Ct. 2016) (finding that employer accepted informal notification of absences and tolerated violations of employee's Internet use at work); *Penn Photomounts, Inc. v. Commonwealth Unemployment Compensation Board of Review*, 417 A.2d 1311, 1314-15 (Pa. Commw. Ct. 1980) (finding that employer tolerated a less formal reporting process for employee absences from work).

¶ 71    Here, Claimants were discharged for falsification of cleaning logs. The evidence, however, establishes that the employee practice of signing cleaning logs despite not performing the cleaning was not only tolerated but actively encouraged by Fresenius. Each Claimant testified that his supervisor encouraged the practice of not cleaning to increase compounding production time, a practice that was followed by the entire department. Each Claimant was acting in accordance with a common work practice, which was sanctioned by Fresenius. Although Fresenius's representative

Higley testified, he offered no evidence to rebut the testimony that Fresenius's corporate practice and culture, as condoned by management, was to falsify cleaning records to maximize production.

¶ 72    We agree with the reasoning of the Pennsylvania courts and hold that the Claimants here did not engage in misconduct. See *Great Valley Publishing*, 136 A.3d at 538. The Claimants cannot be said to have engaged in willful misconduct because they followed the express directives of Fresenius management, notwithstanding Fresenius's contrary written policy. In addition, we agree with the circuit court's observation that affirming the Board's decisions here "could be seen as tacitly condoning Fresenius's fraud and its violation of safety standards" and could encourage other companies to adopt similar practices. Because we are left with the definite and firm conviction that the Board's denials of Claimants' unemployment claims based on willful misconduct was error (see *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393), we affirm the circuit court's decision to reverse the Board's decision to deny benefits in each of these consolidated appeals.

¶ 73    Considering our disposition, we need not reach the Claimants' argument that the Board erred in declining to consider referee decisions granting unemployment benefits to many other Fresenius employees who were discharged for the same reason, as outlined in counsel's letters to the Board of January 14, January 18, and January 20, 2021. However, the seeming inconsistency between the Board's decisions upholding the denial of unemployment benefits to the Claimants here and the decisions by referees reversing the denial of unemployment benefits for many of the other employees who Fresenius terminated on the same day and for the same reason, as well as the Board's inexplicable decision not to consider referee decisions in other Fresenius cases issued *after* the referee decisions in the present cases because counsel "failed to set forth a sufficient

explanation showing that for reasons not his fault and outside his control he was unable to introduce the evidence" at the hearing before the referee, raises further questions about the Board's decision-making process, an issue we turn to next.

¶ 74                                    B. Decision-Making by the Board

¶ 75    In their opening brief, the Claimants contend that Board staff attorneys review referee decisions and draft decisions for the Board, which then "rubber stamps" them without conscientiously considering and deciding each case. The Claimants believe their rights are violated when fewer than all Board members actively participate in decision-making. The Board responds that

> "each of Board's three administrative decisions [in these consolidated appeals] reflects that
> the Board reviewed the record, and the Board members' signatures certify the decision.
> The Board's actions are also entitled to a presumption of good faith, as an adjudicatory
> board is 'presumed to act lawfully and is entitled to the presumption that it properly read
> and considered the evidence.' "

See *Masood v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2023 IL App (1st) 220657, ¶ 77. The Board argues that a party alleging official corruption must overcome that presumption of honesty and good faith (see *Gillenwater v. Honeywell International, Inc.*, 2013 IL App (4th) 120929, ¶ 127), and the Claimants have offered nothing to overcome this presumption.

¶ 76    The Claimants' argument is undeveloped but draws attention to the Board's decision-making process, calling into question whether all Board members truly participate in each decision as the law requires.

¶ 77 Unemployment insurance benefits are a conditional right that may not be denied without due process of law and " '[t]he requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determination thereon.' " (Internal quotation marks omitted.) *Lachenmyer v. Didrickson*, 263 Ill. App. 3d 382, 387-88 (1994) (quoting *Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115, 128-29 (1976)). While due process does not preclude the practicable administrative procedure of having a hearing referee take evidence and another officer make the decision, the officer still must consider the evidence that justifies it. *American Welding Supply Co. v. Department of Revenue*, 106 Ill. App. 3d 93, 97-98 (1982) (citing *Morgan v. United States*, 298 U.S. 468 (1936)); see also *Daniels v. Police Board of Chicago*, 338 Ill. App. 3d 851, 863 (2003) (in administrative adjudication, due process requires the decision-making body to consider the evidence in the report of proceedings before the hearing officer and base its determination thereon); *Morgan*, 298 U.S. at 482 (officers who "make[ ] the determinations must consider and appraise the evidence which justifies them"); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992) (agency members making final decisions must "review the record of proceedings"); *KFC National Management Corp. v. National Labor Relations Board*, 497 F.2d 298, 306 (2d Cir. 1974) (National Labor Relations Board decision invalid under fundamental concepts of administrative due process where two of its three board members did not participate in decision-making, but instead gave their proxies to their senior staff attorneys to vote on their behalf).

¶ 78 Unemployment insurance claims are initially determined by a claim's adjudicator. 820 ILCS 405/702 (West 2020). A party may appeal an adverse decision to a referee, who typically conducts a telephonic evidentiary hearing and issues a written decision with findings of fact and

conclusions of law. *Id.* § 800. If a party is dissatisfied with the referee's decision, "further appeal to the Board of Review" may be taken (*id.* § 801(A)), and the "Board of Review may *** affirm, modify, or set aside any decision of a Referee" (*id.* § 803). Although the Board does not take evidence, it is the ultimate fact-finding and decision-making body. *Lachenmyer*, 263 Ill. App. 3d at 386. In that capacity, "[t]he Board is obligated to consider the referee's findings but must also review the record and make its own independent assessment of the evidence." *Id.* at 387; see *Gregory v. Bernardi*, 125 Ill. App. 3d 376, 379 (1984) (Board is to make its own independent assessment of the evidence on record). The "Board of Review shall make a final determination on the appeal [from the referee's decision] within 120 days of the date of the filing of the appeal." 820 ILCS 405/803 (West 2020). A party aggrieved by a Board decision may seek administrative review in the circuit court under the Administrative Review Law. *Id.* § 1100.

¶ 79 Under section 243 of the Act, the "Board of Review" is defined as the body "created by Section 5-125 of the Departments of State Government Law." *Id.* § 243. Section 5-125 of the Departments of State Government Law, in turn, states that the "board of review"

> "shall consist of 5 members, 2 of whom shall be representatives of a labor organization recognized under the National Labor Relations Act, 2 of whom shall be representative citizens chosen from the employing class, and one of whom shall be a representative citizen not identified with either the employing class or a labor organization." 20 ILCS 5/5-125 (West 2020).

The Board is required to exercise its statutorily conferred duties "in its own name and without any direction, supervision, or control by the Director [of IDES]." 20 ILCS 1005/1005-110 (West

- 28 -

2020); see *Fedorev v. Doherty*, 305 Ill. App. 3d 355, 360 (1999) ("The plain language of [the Act] indicates that, although Doherty is the Director of the IDES, Doherty does not direct the Board.").

¶ 80    Each of the Board's decisions in these consolidated appeals state: "[*w*]*e* have reviewed the record of the evidence in this matter, including the transcript of the testimony submitted at the hearing conducted by telephone on [date], at which the claimant and employer appeared and testified." (Emphasis added.) The pronoun "we," referring to the Board members, appears throughout the Board's decisions. The Board's decisions are signed by every member (although here they are signed by only four of the five members). The signature of a Board member on a Board decision means that the Board member reviewed the evidentiary record, considered the parties' contentions on appeal, and exercised independent judgment in deciding the appeal.

¶ 81    Claimants' contention on appeal that Board members act as "rubber stamps" prompted us to question the Board's counsel at oral argument about the Board's decision-making process. We asked, for example, whether the full complement of Board members considers the record and conscientiously decides appeals from referee decisions. To get at the issue from another angle, we asked about dissents in Board decisions, expecting there to be at least some considering that the Board consists of two members of the labor class and two members of the employer class. After the Board's counsel said that he did not know the answers, we asked him whether he could represent to us that the members of the Board whose signatures appear on the decisions before us had any role in those decisions. He stated he could not make that representation. Accepting our invitation at argument, we granted the Board's counsel leave to file a supplemental brief to "answer[ ] the questions we raised at oral argument about the Board's general decision-making process, including why there does not appear to be any history of dissent in Board decisions." We

stated that the Board was "not required to explain its specific decision-making process in these consolidated appeals" and should include "facts of which we may take judicial notice." The Board's supplemental briefing did not answer any of our questions.

¶ 82    However, we find answers to our questions in the IDES Unit Clarification Decision, where an administrative law judge heard evidence to determine whether attorneys who draft decisions for the Board, known as Board hearing referees, are managerial and, therefore, excluded from collective bargaining either as a matter of law or matter of fact. See IDES Unit Clarification Decision, *supra*.

¶ 83    The State employer argued that Board "hearing referees" (not to be confused with the referees whose decisions are appealed to the Board) were managerial because they "act as surrogates" for the Board and that they are " 'the whole game' when it comes to determining eligibility for benefits." *Id.* at 2-3. After hearing testimony and receiving evidence in 2017, the ILRB ALJ, in her 2018 recommended decision and order, made extensive findings of fact, among them the interplay between the Board hearing referees, the supervisor of the Board hearing referees, and members of the Board. There are eight Board hearing referees (*id.* at 5), who

> "review the decisions issued by the lower authority hearing referees, including the entire administrative record. The hearing referees listen to the recording of the phone hearing or read the transcript, if the case has been transcribed. They evaluate the evidence, make credibility determinations, and draft a Board of Review decision that affirms, modifies, or reverses the lower authority's decision." *Id.* at 20.

The Board hearing referee then submits his draft decision to his supervisor, who may accept or reject the draft. *Id.* at 21.

¶ 84    The ILRB ALJ then explained the Board's involvement in the decision-making process:

"Once [the hearing referee supervisor] accepts the draft, he sends it to one Board member for review. If the draft decision allows benefits, the[n] [the hearing referee supervisor] provides the decision to a member from the employer class because in those cases the employer class is adversely affected. If the draft decision denies benefits, [the hearing referee supervisor] provides the decision to [a] member from the employee class because in those cases, the employee class is adversely affected.

The Board of Review member may either accept the decision, reject it, or ask for modifications. If the member rejects the draft or has comments, [the hearing referee supervisor] discusses the case with the hearing referee who wrote it and asks for their comments. If the hearing referee finds that he made a mistake, he will modify the decision and resubmit it. If the hearing referee stands by the decision, then [the hearing referee supervisor] sends the decision to the [Board of Review] chairman for a tie-breaker vote.

If [the hearing referee supervisor] and the hearing referee disagree on a case, the hearing referee gets the final say because the referee writes the decision and reviews the evidence. When [the hearing referee supervisor] informs the hearing referee that either he or a Board member have rejected the draft decision, the hearing referee is not required to change the decision. Hearing referees sometimes ask [the hearing referee supervisor] his opinion of such cases, and he has told them that it is their decision and they should write it as they see fit. The Board member who rejected the decision then dissents. The chairman of the Board's decision becomes the final agency decision." *Id.* at 21-22.

¶ 85    The ILRB ALJ concluded that Board hearing referees are not managerial as a matter of law but are managerial as a matter of fact. She determined that Board hearing referees "lack any independent authority to act on behalf of the office holder or to exercise any of the office holder's 'same sovereign power.' " *Id.* at 37. On the other hand, she determined that Board hearing referees were managerial because, among other things, a referee's

> "recommended draft decision may become a decision of the Board even if one reviewing Board member rejects it. In such cases, the draft becomes the Board's decision if the [Board] Chairman accepts it, and the [Board] member who initially rejected the recommended draft decision simply dissents. Notably, the agency does not require the Board of Review [hearing] referee to change his recommendation if the first Board member rejects it." *Id.* at 41.

¶ 86    We do not know whether the procedure described in the IDES Unit Clarification Decision is still in place today. But if it is, this confirms that only one member of the Board commonly considers and decides an appeal, which explains the absence of dissent in Board decisions. And when the Board member and Board hearing referee disagree, the Board chair acts as a "tie-breaker," indicating not only that the Board hearing officer has a vote but that such vote has the same weight as a Board member's vote. If the Board chair agrees with the Board hearing referee, then the Board member may dissent. However, we are not aware of any dissents in Board decisions.

¶ 87    The Act states that the "Board of Review" shall decide appeals. Neither the Act nor its implementing regulations (see 56 Ill. Adm. Code 2720.300 (2019)), authorize the Board to delegate its decision-making responsibility to a single member or nonmembers. To be sure, the

Act and IDES regulations distinguish between the duties and prerogatives of the "Board or Review" and "member[s] of the Board of Review." Compare 820 ILCS 405/803 (West 2020) (The "Board of Review shall make a final determination on the appeal [from the referee's decision] within 120 days of the date of the filing of the appeal," and the "Board of Review may *** affirm, modify, or set aside any decision of the Referee"), with *id.* § 1003 (the deposition of a witness may be taken at the instance of a "member of the Board of Review"), and 56 Ill. Adm. Code 2720.15, adopted at 8 Ill. Reg. 24,957, 24,970-71 (eff. Jan. 1, 1985) ("No *** member of the Board of Review shall participate in any manner in any investigation or proceeding under the Act if he has a financial or other direct personal interest in the outcome of the proceeding or investigation."). So, it is the "Board of Review," not a "member of the Board," that is duty-bound to "make a final determination on the appeal." 820 ILCS 405/803 (West 2020).

¶ 88    By design, the legislature intended for each member of the Board to participate in the decision-making process. The Board consists of two labor organization representatives, two employer organization representatives, and one member who represents neither. Recognizing the possibility that members may disagree, the General Assembly provided an odd number of members. We find nothing in the Act that would allow one member to decide an appeal without the other four members participating. Additionally, we find nothing in the Act that would provide a Board hearing referee with a vote, let alone on par with that of a Board member.

¶ 89    We acknowledge that the Board members' substantial workload, part-time status, and *de minimis* salary are incompatible with their statutory obligations. This situation exacerbates the problem. However, no judgment can be deemed independent or informed without an understanding and analysis of the evidence in the record. If Board members simply rubber stamp

a staff member's or other Board member's decision, then they flout the statutory framework for administrative adjudication and potentially deprive parties of their administrative due process rights. See *Morgan*, 298 U.S. at 481 ("For the weight ascribed by the law to the findings—their conclusiveness when made within the sphere of the authority conferred—rests upon the assumption that the officer who makes the findings has addressed himself to the evidence and upon that evidence has conscientiously reached the conclusions which he deems it to justify. That duty cannot be performed by one who has not considered evidence or argument. It is not an impersonal obligation. It is a duty akin to that of a judge.").

¶ 90　　Because the concerns we have raised affect the fairness and integrity of the decisions of the Department of Employment Security's Board, we urge the governor and General Assembly to examine its processes and take whatever action is necessary to ensure that parties are afforded the statutory and due process rights to which they are entitled.

¶ 91　　　　　　　　　　　　　III. CONCLUSION

¶ 92　　For the reasons outlined above in section II(A) (*supra* ¶¶ 63-73), we affirm the judgments of the circuit court of Cook County and reverse the decisions of the Board of Review in each of these consolidated appeals.

¶ 93　　Circuit court judgments affirmed; Board decisions reversed.

---

*Soni v. Department of Employment Security*, 2024 IL App (1st) 220137

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 21-L-50137, 21-L-50143, 21-L-50152; the Hon. Daniel P. Duffy and the Hon. John J. Curry Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Janon Fabiano and Alex S. Moe, Assistant Attorneys General, of counsel), for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Adam Goodman, of Goodman Tovrov Hardy & Johnson, LLC, of Chicago, for appellees. |

---